319 F.3d 732
 Theresa O'SULLIVAN, for Herself and All Others Similarly Situated; et al., Plaintiffs,
Jon Maynard, for Himself and All Others Similarly Situated; Heather Maynard, Plaintiffs-Appellees,
v.
COUNTRYWIDE HOME LOANS, INC., Defendant-Appellant.
Sergio Ruiz, Respondent-Appellee,
v.
Countrywide Home Loans, Inc.; Peirson & Patterson, L.L.P., Petitioners-Appellants.
 No. 01-21028.
 No. 01-51190.
 United States Court of Appeals, Fifth Circuit.
 February 7, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED John Craig Roberson (argued), Hill & Parker, Mark A. Carrigan, Law Office of Mark A. Carrigan, Houston, TX, for Jon and Heather Maynard.
 Robert T. Mowrey (argued), Cynthia Keely Timms, Thomas George Yoxall, Locke, Liddell & Sapp, Dallas, TX, John C. Englander (argued), Goodwin Procter, Boston, MA, for Countrywide Home Loans, Inc.
 Olan John Boudreaux (argued), Wayne Fisher, James A. Huguenard, Fisher, Boyd, Brown, Boudreaux & Huguenard, Houston, TX, Dennis K. Drake, Law Offices of Dennis K. Drake, San Antonio, TX, for Ruiz.
 Appeals from the United States District Court for the Southern District of Texas and the Western District of Texas.
 Before JONES, SMITH and SILER,* Circuit Judges.
 JERRY E. SMITH, Circuit Judge:
 
 
 1
 In these consolidated appeals, each district court certified a class of plaintiffs who paid mortgage preparation fees to law firms selected by defendant Countrywide Home Loans, Inc. ("Countrywide"), a mortgage broker. Plaintiffs allege that Countrywide accepted kickbacks from the law firms in violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607(a)-(b), and violated the Texas Unauthorized Practice of Law ("UPL") Statute, TEX. GOV'T CODE §§ 83.001-83.006. Because we conclude that both district courts improperly certified the classes, we reverse and remand.
 
 I.
 
 2
 Countrywide originates and services mortgage loans, offering approximately 250 loan programs to potential homeowners. Consumers can obtain a loan either through one of Countrywide's thousands of retail storefront locations or through a mortgage broker.
 
 
 3
 Countrywide prepares a set of closing documents for each loan. Consistent with state law, Countrywide uses attorneys to prepare these documents for its wholesale and retail loan operations.[1] Federal law requires Countrywide to provide a HUD-1 Settlement Statement ("HUD-1") to borrowers and sellers to disclose the various settlement costs, including attorney's fees, that are listed as a "Document Preparation Fee" on the HUD-1.
 
 
 4
 Plaintiffs Jon Maynard (No. 01-21028) and Sergio Ruiz (No. 01-51190) obtained home mortgage loans from Countrywide. Maynard obtained his loan from one of Countrywide's Texas retail locations; Ruiz transacted with Countrywide's wholesale division through a mortgage broker. At closing, both paid document preparation fees that appeared as a direct payment to the law firms on their HUD-1 statements. Maynard's HUD-1 reflected a payment of $225 to Gregg & Valby,[2] a law firm serving as the exclusive residential mortgage document preparer for Countrywide's Texas retail division. Ruiz's HUD-1 showed a payment of $200 to Peirson & Patterson, a preparer for Countrywide's wholesale division.
 
 
 5
 Gregg & Valby and Peirson & Patterson provide legal services to Countrywide through a time-saving process that permits the processing of documents in bulk. Countrywide owns a computer software system, known as EDGE, containing various legal and non-legal documents necessary for the completion of residential mortgage transactions. Once a potential homeowner is approved for a loan, a Countrywide employee enters data concerning the transaction into EDGE, including information on the borrower and the property, the loan amount, and applicable interest rates. This process takes between two and five hours.
 
 
 6
 The EDGE system generates an initial set of mortgage closing documents, the quantity of which varies depending on the type of loan. In the retail division, the documents are printed by Countrywide employees and faxed to Gregg & Valby's offices, where they are reviewed by attorney and non-attorney loan specialists. Gregg & Valby prepares a response sheet for Countrywide indicating any needed corrections. Approximately half of the loan documents are sent back to Gregg & Valby for a second review, and some are sent back additional times before final approval.
 
 
 7
 Peirson & Patterson's employees, on the other hand, are located on-site at Countrywide's wholesale division. Although Countrywide employees still initially enter data into the EDGE system, Peirson & Patterson employees select and print the mortgage forms. Like the retail division, representatives of the law firm review the forms for content and accuracy. Nevertheless, Peirson & Patterson employees make any necessary corrections, so there is no shuffling of papers between separate offices.
 
 
 8
 A portion of the document preparation fee paid to Gregg & Valby and Peirson & Patterson is reimbursed to Countrywide, which contends this portion of the fee represents its share of the costs associated with the preparation of each set of loan closing documents. For example, Countrywide lists the use and maintenance of its EDGE system, the time spent by its employees inputting and gathering data, and the costs of telephone calls, faxes, paper, and photocopying.
 
 
 9
 The reimbursement amounts are set by schedule and vary according to loan type.[3] For the Maynard's "Conventional Purchase with Deed," Countrywide was reimbursed $130 out of the $225 paid to Gregg & Valby. Similarly, $100 of Ruiz's $200 document preparation fee was reimbursed to Countrywide. The HUD-1 does not reflect the fee splitting, but rather shows only a direct payment of the entire amount to the respective law firm.
 
 
 10
 Maynard and Ruiz allege that the fee splitting constitutes a "kickback" or "referral fee" in violation of RESPA § 8(a)-(b).[4] In addition, plaintiffs sued Countrywide under the Texas UPL Statute,[5] arguing that its participation in the preparation of loan documents constituted the unauthorized practice of law.
 
 
 11
 In Maynard, the district court certified a class consisting of:
 
 
 12
 All persons in Texas who, as part of a residential real estate loan transaction with Countrywide, from January 10, 1996 to the present, were charged a "Document Preparation Fee" (or portion of a document preparation fee) on their HUD-1 Settlement Statement, where Countrywide received a portion of the document preparation fee, and Gregg & Valby is listed as the provider of document preparation services.
 
 
 13
 Similarly, in Ruiz, the district court certified the following class:
 
 
 14
 All persons [since April 1993]:(1) who obtained loans from Countrywide secured by residential real property in Texas; and (2) who paid for document preparation fees and/or attorney's fees charged by Peirson & Patterson as reflected by the HUD-1 Settlement Statement.
 
 
 15
 Over objections that significant loan-to-loan variations in the amount and type of work performed require an individual analysis of each transaction to determine the reasonableness of the reimbursed fee, the district courts found "the practice itself" of reimbursing Countrywide for its services satisfied predominance. This court permitted Countrywide to appeal the class certification orders pursuant to FED.R.CIV.P. 23(f).
 
 II.
 
 16
 We review the certification of a class for abuse of discretion. Stirman v. Exxon Corp., 280 F.3d 554, 561 (5th Cir.2002). Because, however, a court abuses its discretion when it makes an error of law, we apply a de novo standard of review to such errors. Id. The party seeking certification bears the burden of demonstrating that the requirements of rule 23 have been met. Allison v. Citgo Petroleum Corp., 151 F.3d 402, 408 (5th Cir.1998).
 
 
 17
 The district court must conduct a "rigorous analysis of the Rule 23 prerequisites" before certifying a class. Castano v. Am. Tobacco Co., 84 F.3d 734, 740 (5th Cir.1996). Among the four prerequisites of Rule 23(a) is the requirement that "there are questions of law or fact common to the class." FED.R.CIV.P. 23(a)(2).[6] Before a class may be maintained under rule 23(b)(3), a court must also determine that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED.R.CIV.P. 23(b)(3). The predominance and superiority requirements are "far more demanding" than is rule 23(a)(2)'s commonality requirement. Amchem Prods. v. Windsor, 521 U.S. 591, 624, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).
 
 
 18
 Determining whether legal issues common to the class predominate over individual issues requires that the court inquire how the case will be tried. Castano, 84 F.3d at 744. This entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class. Although this inquiry does not resolve the case on its merits, it requires that the court look beyond the pleadings to "understand the claims, defenses, relevant facts, and applicable substantive law." Id. at 744. Such an understanding prevents the class from degenerating into a series of individual trials.
 
 A.
 
 19
 RESPA seeks to ensure that real estate consumers "are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices." 12 U.S.C. § 2601(a). Both classes were certified under § 2607(a)-(b), which states:
 
 
 20
 (a) No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding ... that business incident to or part of a real estate settlement service ... shall be referred to any person.
 
 
 21
 (b) No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service ... other than for services actually performed.
 
 
 22
 12 U.S.C. § 2607(a)-(b). Despite a prohibition against kickbacks and referral fees, RESPA § 8(c) permits "the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." 12 U.S.C. § 2607(c)(2).
 
 
 23
 Both classes were certified after a determination that rule 23(a)(2)'s commonality requirement is met by the issue of whether Countrywide's receipt of compensation from Gregg & Valby and Peirson & Patterson constitutes an illegal kickback or referral fee arrangement. In assessing rule 23(b)(3) predominance, both courts rejected Countrywide's contention that liability should hinge on determinations of whether, in individual cases, a reasonable relationship exists between the value of the alleged services provided and payments received by Countrywide.[7] Rather, both courts found that plaintiffs could show "the practice itself" bears no reasonable relationship to the value of Countrywide's services en toto, while relying on the fee splitting schedule for any post-liability calculation of damages.
 
 1.
 
 24
 Congress authorized the Secretary of HUD to "prescribe such rules and regulations, to make such interpretations, and to grant such reasonable exemptions for classes of transactions, as may be necessary to achieve the purposes" of RESPA. 12 U.S.C. § 2617(a). HUD defines the § 8(c) exception in terms of a reasonable relationship test, holding that where "the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for goods or services actually performed or provided." 24 C.F.R. § 3500.14(g)(2).[8] This test was promulgated for the purpose of assisting courts in ferreting out kickbacks disguised as legitimate payments for goods and services in complex real estate settlement transactions.
 
 
 25
 In separate policy statements issued in 1999 and 2001, HUD clarified the reasonable relationship test in the context of lender-broker payments known as yield spread premiums. In its 1999 Policy Statement, HUD expressed the reasonable relationship test from 24 C.F.R. § 3500.14(g)(2) as a two-part inquiry: (1) "whether goods or facilities were actually furnished or services were actually performed for the compensation paid"; and (2) "whether the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed."[9] HUD expressly limited the 1999 Policy Statement to payments between lenders and mortgage brokers.[10]
 
 
 26
 Yield spread premiums, analogous in some ways to Countrywide's reimbursement fee, enable borrowers to finance up-front closing costs by paying a higher interest rate on their home loan. HUD Policy Statement 1999, at 10,081. The yield spread premium is a payment from the lender to the broker, the amount of which reflects the loan's interest rate and consequently the lender's profits. Id. Although yield spread premiums are desirable from a policy standpoint, because they permit borrowers to finance up-front closing costs, they are criticized by some as blatant referral fees, varying only according to a higher interest rate pushed on the borrower and not by the broker's actual services.[11]
 
 
 27
 Following HUD's 1999 Policy Statement, a few courts certified class actions contesting yield spread premiums. In Culpepper v. Irwin Mortgage Corp., 253 F.3d 1324 (11th Cir.2001), cert. denied, 534 U.S. 1118, 122 S.Ct. 930, 151 L.Ed.2d 893 (2002), for example, the court found that the broker's failure to tie the yield spread premium to specific goods or services was sufficient to create a factual issue as to the overall intent of the payment.[12] From the 1999 Policy Statement's two-part test, Culpepper interpreted the term "for the compensation paid" as requiring the defendants to tie the disputed fee to specific goods or services provided by the broker. Id. at 1329. In doing so, the Culpepper court determined that RESPA § 8 class actions could be certified by looking only to the first prong of the HUD test—whether goods or services were provided for the disputed fee paid.
 
 
 28
 HUD disclaimed the Culpepper holding in its 2001 Policy Statement,[13] finding class certification in yield spread premium cases like Culpepper inappropriate because "neither Section 8(a) of RESPA nor the 1999 [Policy Statement] supports the conclusion that a yield spread premium can be presumed to be a referral fee" simply because the lender does not have specific knowledge of what services the broker has performed. HUD Policy Statement 2001, at 53,055. Instead, as the 2001 Policy Statement clarifies, there is no requirement that the lender and broker tie the disputed fee to specific services provided. So long as the total compensation paid to the broker is reasonably related to the total value of the goods or services actually provided, there is no § 8 liability.[14]
 
 
 29
 We defer to 24 C.F.R. § 3500.14(g)(2), as a broad agency rule, insofar as it provides a mechanism for detecting kickbacks where the § 8(c) exception is invoked. Where, as here, agency regulations are promulgated under express congressional authority, they are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[15] Given the failure of § 2607(a)-(b) to provide a workable liability standard, we cannot say that the reasonable relationship test is manifestly contrary to the plain meaning of the statute. If anything, RESPA's stated goal of eliminating "kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services," 12 U.S.C. § 2601(b)(2), is furthered by the reasonable relationship test, so we are bound to apply it in assessing certification.
 
 
 30
 In addition, we look to the 1999 and 2001 Policy Statements insofar as they express the reasonable relationship test as a two-part inquiry, asking first whether Countrywide provided goods or services in connection with the particular transaction, and second, whether Countrywide's compensation is reasonably related to the value of those goods or services. We do not decide whether the policy statements are entitled to Chevron deference,[16] nor whether, for purposes of the reasonable relationship test, the proper reference is the total mortgage transaction or only the reimbursement and services associated with Countrywide's preparation of legal documents.[17] Either way, both courts abused their discretion in certifying the RESPA claims.
 
 2.
 
 31
 Plaintiffs concede Countrywide performed some services in furtherance of document preparation, but argue that its reimbursements do not represent the reasonable value of those services. We apply HUD's reasonable relationship test, which holds that any excess may be used as evidence of a kickback or referral fee.
 
 
 32
 Using a rationale similar to that of the Eleventh Circuit in certifying a yield spread premium class in Culpepper, both courts found certification proper, because they believe predominance exists regarding whether "the overall practice" violates RESPA. Plaintiffs indeed argue that they have evidence showing the reimbursement payments were not tied to the services provided by Countrywide, and thus violate § 8. Countrywide argues the HUD reasonable relationship test requires a transaction-by-transaction inquiry to assess whether Countrywide's reimbursement is reasonably related to the undisputed services it provides in connection with document preparation.
 
 
 33
 Both courts erred by failing to acknowledge Countrywide's use of the § 8(c) exception as a defense. Castano, 84 F.3d at 744. Consistently with the HUD reasonable relationship test, individualized factfinding will be required for each transaction on the issues of what goods or services Gregg & Valby and Peirson & Patterson provided to Countrywide, and whether the flat fee charged was reasonably related to their value. Plaintiffs do not attempt to argue that Countrywide provided identical goods and services—in type or quantity—in each transaction.
 
 
 34
 The overall intent of the reimbursement practice, although perhaps satisfying the rule 23(a)(2) commonality requirement as a factual issue common to all or at least most class members,[18] does not satisfy the more exacting requirements of predominance. The only way the overall practice may be proven to violate RESPA, consistently with the HUD liability standard, is to examine the reasonableness of payments for goods and services. This inquiry must be performed on a transaction-by-transaction basis, because a single finding of liability based on an unreasonable relationship between goods and services does not necessitate the conclusion that such unreasonableness exists on a classwide basis.[19]
 
 
 35
 In both proposed class actions, there is a question whether an overall practice or policy violates a statute. But rule 23(b)(3) predominance requires a court to ask, in light of how liability is established under the relevant statute, whether common questions predominate over individual ones. Because RESPA § 8 liability is established by making individual comparisons of compensation to actual services, not by presuming fire where there is smoke, we find certification improper.
 
 B.
 
 36
 Both courts also certified classes under the UPL claim. Texas law forbids nonlawyers such as Countrywide from charging or receiving, either directly or indirectly, "any compensation for all or any part of the preparation of a legal instrument affecting title to real property." TEX. GOV'T CODE § 83.001. Plaintiffs contend that Countrywide's role in preparing the loan closing documents violates the UPL statute. As with RESPA, however, the question of class certification is complicated by the fact that chapter 83 does not prohibit "an attorney from paying secretarial, paralegal, or other ordinary and reasonable expenses necessarily and actually incurred by the attorney for the preparation of legal instruments." TEX. GOV'T CODE § 83.002. These services are not proscribed by chapter 83, because they do not require the use of "legal skill or knowledge."[20]
 
 
 37
 Countrywide initially argues that neither Maynard nor Ruiz has standing under the Texas UPL statute. As an "inherent prerequisite to the class certification inquiry," Rivera v. Wyeth-Ayerst Labs., 283 F.3d 315, 319 (5th Cir.2002) (citation omitted), we must determine whether plaintiffs have a valid cause of action under Texas law and whether they have stated an injury-in-fact. Id. The statute confers a cause of action on "any person who pays a fee prohibited by [TEX. GOV'T CODE § 83.001]." TEX. GOV'T CODE § 83.005.
 
 
 38
 Countrywide argues that Maynard and Ruiz cannot sue under § 83.005, because the law firms, not plaintiffs, actually reimbursed the fee. We disagree. Section 83.001 prohibits those fees paid either "directly or indirectly" for the preparation of real estate legal documents. Realizing that Maynard and Ruiz, as borrowers, ultimately paid all transaction fees, the fact that plaintiffs indirectly paid the disputed fee by first paying a document preparation fee to the law firms does not defeat their right to sue. Countrywide's narrow interpretation of chapter 83 standing would eviscerate the term "indirectly" from § 83.001.
 
 
 39
 Insofar as Countrywide argues that plaintiffs have not suffered a legally cognizable injury-in-fact because they do not complain they were charged too high a fee for the mortgage documents or that the documents were deficient, they ignore the fact that §§ 83.001 and 83.003 create a right to recoup fees paid to nonlawyers who exercise legal skill or knowledge in preparing legal documents. Because only those persons who pay a fee can sue under § 83.005, the UPL statute is distinguishable from those statutes violating Article III that permit "any person" to bring suit.[21]
 
 
 40
 Initially, rather than pointing to specific acts requiring the use of legal skill or knowledge common to each and every transaction, Maynard and Ruiz allege that Countrywide's actions "across the board" violate the Texas UPL statute.[22] As with the RESPA claims, both courts found that individual issues did not predominate, because it was Countrywide's overall practice that violates the UPL statute. The district courts' reasoning fails to account for Countrywide's intent to use § 83.002 as a defense, specifically that its reimbursements were ordinary and reasonable compensation for secretarial or clerical assistance.
 
 
 41
 Ruiz takes issue with the overall reimbursement scheme by arguing that it conflicts with rule 5.04 of the Texas Disciplinary Rules of Professional Conduct, which prohibits lawyers from splitting fees with nonlawyers.[23] Assuming arguendo that the reimbursement scheme violates rule 5.04,[24] Ruiz points to no authority suggesting that chapter 83 should be construed in light of the Texas Disciplinary Rules of Professional Conduct. Whereas the disciplinary rules apply only to lawyers, chapter 83 imposes liability on non-lawyers.[25] Given § 83.002's failure to mention rule 5.04 or any authority suggesting that its terms do not mean what they say, we will construe the statute according only to its plain language, which sets no limitation regarding how a lawyer may pay for secretarial or clerical assistance.
 
 
 42
 Maynard, while similarly arguing that the overall reimbursement scheme is inconsistent with the Texas UPL statute, contends that some of Countrywide's individual practices violate chapter 83. For instance, Countrywide employees examine and construe previous mortgage documents in order to select which one of the more than 250 forms will be used for a particular transaction. Without deciding whether this practice constitutes the unauthorized practice of law, we note that Countrywide does not deny that its employees are responsible for selecting the proper form in each and every transaction.
 
 
 43
 Similarly, it is undisputed that Countrywide employees enter data into EDGE, generate an initial set of closing documents, fax the documents to Gregg & Valby, and enter suggested changes in each transaction. A finding that any of these practices, standing alone, requires the use of legal skill or knowledge is sufficient to confer liability under the Texas UPL.[26]
 
 
 44
 Even though a class is theoretically certifiable on these issues, we find that an apportioned calculation of damages—required by the Texas UPL statute—means that individual issues predominate. Section 83.001 prohibits compensation for "all or any part" of the preparation of mortgage documents, while Section 83.005 grants "recovery of the fee paid" to "[a] person who pays a fee prohibited by [chapter 83]." In deciding whether the term "fee" should be interpreted as (1) the amount charged to Plaintiffs on their HUD-1's, (2) the amount reimbursed to Countrywide, or (3) the portion of the reimbursement actually spent on unauthorized services, we are guided by Section 83.005's requirement that a recovered fee be "prohibited by [chapter 83]." Only the last of the three possibilities is a fee prohibited in its entirety. Therefore, a plaintiff suing under the Texas UPL statute is entitled to recover only that portion of his total fee used to actually finance the unauthorized practice of law.
 
 
 45
 The extent (but not the nature) of Countrywide's participation in the transactions varies, making individualized calculations of damages predominate. Where the plaintiffs' damage claims "focus almost entirely on facts and issues specific to individuals rather than the class as a whole," Allison, 151 F.3d at 419, the potential exists that the class action may "degenerate in practice into multiple lawsuits separately tried," Castano, 84 F.3d at 745 n. 19 (citation omitted). In such cases, class certification is inappropriate.[27]
 
 
 46
 As we have noted, there are several practices common to each transaction that may or may not require the use of legal skill or knowledge. Although the propriety of each practice can be determined on a classwide basis, the calculation of damages cannot. For example, at least one practice—data entry—is almost surely a secretarial or clerical function within the meaning of the § 83.002 exception.[28] Countrywide has demonstrated that the amount of data entry required in each transaction varies depending on the type of loan and the number of corrections required by Gregg & Valby. Under the recovery provision of the Texas UPL, Countrywide is entitled to keep the reasonable value of its secretarial or clerical services even if the other practices violate Chapter 83. In light of the individual calculation of damages that is required, the district court abused its discretion in certifying the UPL claims.
 
 
 47
 The orders certifying the respective classes are REVERSED, and these matters are REMANDED for further proceedings.
 
 
 48
 Appendix

 INVOICE PAYMENT TO AMOUNT RETAINED
LOAN TYPE AMOUNT COUNTRYWIDE BY GREGG & VALBY

Conventional Purchase $ 175 $ 100 $ 75
Conventional Purchase $ 225 $ 130 $ 95
with Deed
Conventional Refinance $ 175 $ 100 $ 75
FHA Purchase $ 175 $ -0- $ 175
FHA Purchase with Deed $ 225 $ 50 $ 175
FHA Refinance $ 150 $ -0- $ 150
VA Purchase $ 175 $ 100 $ 75
VA Purchase with Deed $ 225 $ 130 $ 95
VA Refinance $ 100 $ -0- $ 100
Second Lien $ 75 $ 45 $ 30
One Time Close $ 295 $ 170 $ 125
 
 
 49
 The Countrywide-Peirson & Patterson rate schedule is less complex: The law firm receives a flat rate of $200 for most loans, of which $100 is reimbursed to Countrywide. For FHA and VA loans only, Peirson & Patterson receives $150, of which Countrywide is reimbursed $50.
 
 
 
 Notes:
 
 
 *
 Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation
 
 
 [1]
 Texas law prohibits non-lawyers from directly or indirectly charging compensation for "all or any part of" the preparation of loan documents affecting the transfer of title to real estate. TEX. GOV'T CODE § 83.001(a)
 
 
 [2]
 In actuality, Maynard paid $175 of the total $225 fee, while the seller paid the remaining $50. Ruiz paid the entire $200 document preparation fee
 
 
 [3]
 The Countrywide-Gregg & Valby fee schedule is set forth in the appendix hereto
 
 
 [4]
 RESPA Section 2607(d)(2) requires defendants to pay treble damages to plaintiffs charged unearned fees. In total, Maynard seeks approximately $90 million in damages for an estimated class of 75,000 borrowers. Ruiz seeks more than $58 million for a class of approximately 80,000 borrowers
 
 
 [5]
 Ruiz also named Peirson & Patterson as a defendant. Because Peirson & Patterson raises essentially the same arguments against certification as does Countrywide, our reference to Countrywide includes Peirson & Patterson unless otherwise indicated
 
 
 [6]
 The four rule 23(a) requirements are: "(1) numerosity (a class so large that joinder of all members is impracticable); (2) commonality (questions of law or fact common to the class); (3) typicality (named parties' claims or defenses are typical of the class); and (4) adequacy of representation (representatives will fairly and adequately protect the interests of the class)."Mullen v. Treasure Chest Casino, L.L.C., 186 F.3d 620, 623 (5th Cir.1999).
 
 
 [7]
 Countrywide does not question numerosity or typicality. Although Countrywide argues that Sergio Ruiz cannot adequately protect the interests of his class pursuant to rule 23(a)(4), we need not address this argument in light of our conclusion that questions of law or fact do not predominate over questions affecting individual class members
 
 
 [8]
 Title 24 C.F.R. § 3500.14(g)(2) states that where a payment does not bear a reasonable relationship to goods or services provided, this fact "may be used as evidence of a violation of section 8."
 
 
 [9]
 Real Estate Settlement Procedures Act Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, 64 Fed.Reg. 10,080, 10,084 (March 1, 1999)
 
 
 [10]
 So far as we can tell, courts have applied both the 1999 and 2001 Policy Statements exclusively in yield spread premium casesE.g., Heimmermann v. First Union Mortgage Corp., 305 F.3d 1257 (11th Cir.2002); Glover v. Standard Fed. Bank, 283 F.3d 953 (8th Cir.2002); Schuetz v. Banc One Mortgage Corp., 292 F.3d 1004 (9th Cir.2002).
 
 
 [11]
 See Schuetz, 292 F.3d at 1015 ("I see the phrase `yield spread premium' as an obfuscatory way of avoiding calling a kickback a kickback.") (Kleinfeld, J., dissenting); Glover, 283 F.3d at 958 ("Some consumers ... allege that this compensation system is illegal under RESPA because it fosters the payment of prohibited referral fees. Others view this practice as an option that fosters home ownership because it reduces the amount of money required from borrowers up-front and out-of-pocket.").
 
 
 [12]
 Culpepper, 253 F.3d at 1332 (noting an absence of evidence showing "that [the lender] negotiates yield spread premiums loan-by-loan, rather than paying them according to terms and conditions common to all loans. Nor does [the lender] contend that it intends some yield spread premiums to pay for services and others to pay for referrals.").
 
 
 [13]
 Real Estate Settlement Procedures Act Statement of Policy 2001-1: Clarification of Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b), 66 Fed.Reg. 53052 (October 18, 2001)
 
 
 [14]
 Id. at 53,055. Following HUD's 2001 Policy Statement, the Eleventh Circuit overruled Culpepper in Heimmermann, 305 F.3d at 1263.
 
 
 [15]
 See also United States v. Mead Corp., 533 U.S. 218, 226-27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) ("[A]dministrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.").
 
 
 [16]
 See Krzalic v. Republic Title Co., 314 F.3d 875, 882-83 (7th Cir.2002) (Easterbrook, J., concurring) ("I am confident that Heimmermann and Schuetz erred in thinking that the Real Estate Settlement Procedures Act Statement of Policy 2001-1 is itself conclusive under Chevron, as opposed to informative (and potentially persuasive).").
 
 
 [17]
 In its discussion of the issue, however, Countrywide appears to argue that liability depends on finding a reasonable relationship between its reimbursement and the value of its document preparation services, not itstotal compensation, goods, and services.
 
 
 [18]
 See Jenkins v. Raymark Indus., 782 F.2d 468, 472 (5th Cir.1986) (stating that the threshold for commonality is not "high," requiring only that "resolution of common questions affect all or a substantial number of the class members") (citation omitted).
 
 
 [19]
 See LaCasse v. Washington Mutual, Inc., 198 F.Supp.2d 1255, 1264 (W.D.Wash.2002) ("Given the possibility that some or all of the defendants' yield spread premiums may have constituted an exchange for goods or services, it would be impossible to determine liability from generalized proof."); Taylor v. Flagstar Bank, F.S.B., 181 F.R.D. 509, 523 (M.D.Ala. 1998) ("[N]o matter what Plaintiffs can easily prove about the general contours of these transactions, Plaintiffs still cannot prove (by a class method) that none of the yield spread premiums at issue were earned through the provision of services.").
 
 
 [20]
 The parties dispute whether liability under § 83.001 requires the exercise of legal skill or knowledge. Given that subchapter G is entitled "Unauthorized Practice of Law," and § 81.101 defines "practice of law" as "any service requiring the use of legal skill or knowledge," it appears that the Texas legislature sought to prohibit nonlawyers from exercising legal skill or knowledge in the preparation of legal documents. This view is supported by an interpretative opinion issued by the Texas Attorney GeneralSee Op. TEX. ATTY. GEN. JM-943, 1988 WL 406255, at *2 (1988) ("What is meant in [chapter 83] by the `preparation of legal instruments' must be decided with reference to the practice of law.").
 
 
 [21]
 See Lujan v. Defenders of Wildlife, 504 U.S. 555, 572-74, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (holding that provision in Endangered Species Act allowing any person to bring a lawsuit to enforce compliance with procedural requirements could not vest standing in plaintiff who had not suffered an injury).
 
 
 [22]
 Maynard, for example, states: "The important point ... is that the focus of the issue truly is on the overall `program,' as the district court correctly noted in its opinion." Ruiz states that "the very nature of the arrangement between Peirson & Patterson and Countrywide is prohibited by Texas law governing the conduct of lawyers."
 
 
 [23]
 Rule 5.04 states that "a lawyer or law firm shall not share or promise to share legal fees with a non-lawyer." TEX. DISCIPLINARY R. PROF'L CONDUCT 5.04(a),reprinted in Tex. Gov't Code Ann., tit. 2, subtit. G app. A (Vernon 1998) (TEX. STATE BAR R. art. X, § 9).
 
 
 [24]
 Nevertheless, we note our inability to discern a meaningful distinction between the Countrywide-Peirson & Patterson fee arrangement characterized by Ruiz as "systematic," and the salary typically paid to a secretary at a law firm, which Plaintiffs concede is permissible under § 83.002. Both fees are pre-determined, scaled, and split from a lawyer's profits. Given that § 83.002 presupposes payments for secretarial or paralegal work, Rule 5.04 cannot be as constraining as Ruiz would have us believe
 
 
 [25]
 It is also worth noting that the Texas Disciplinary Rules of Professional Conduct are promulgated by the Texas Supreme Court, while chapter 83 is a duly enacted statute by the state legislature
 
 
 [26]
 Ruiz cannot make this argument, because Peirson & Patterson employees (attorney and non-attorney), not Countrywide employees, select and generate the mortgage forms in the wholesale division. The only practice performed by Countrywide employees in every wholesale transaction is data entry, a practice that even Ruiz does not argue is non-secretarial. As for Peirson & Patterson's potential liability for permitting its non-attorney employees to select and generate forms, the analysis is the same as for Countrywide's retail division inMaynard.
 
 
 [27]
 Allison, 151 F.3d at 413 ("[A]s claims for individually based money damages begin to predominate, the presumption of cohesiveness decreases while the need for enhanced procedural safeguards ... increases.") (citation omitted); Montelongo v. Meese, 803 F.2d 1341, 1351 (5th Cir.1986) ("stating that claims are unsuitable for class treatment when individual questions, such as reliance and damages, predominate over class questions") (emphasis added). But see Bertulli v. Indep. Ass'n of Cont'l Pilots, 242 F.3d 290, 298 (5th Cir.2001) ("Although calculating damages will require some individualized determinations, it appears that virtually every issue prior to damages is a common issue."). Importantly, in Bertulli, the court recognized the plaintiffs' claims for injunctive relief on top of money damages, noting that "not all of the relief requires individualized determination." Id.
 
 
 [28]
 The 1988 Texas Attorney General Opinion supports our view that data entry likely qualifies as secretarial-type work under the § 83.002 exception: "[T]he mere act of recording a borrower's responses to the questions on a standard form probably does not require legal skill or knowledge and would therefore not be practicing law ...." Op. TEX. ATTY. GEN. JM-943, 1988 WL 406255, at *2